**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2255-19
               A-3381-19

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

CHRISTOPHER R. SMALL,
a/k/a STICKEY SMALL,
CHRISTOPHER J. SMALL,
STICKY SMALL, and
CHRISTOPHER SMALL,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

CHRISTOPHER M. VERITY,
a/k/a CHRISTOPHER VERITY,
LEONARD C. VERITY, and
DENNISVIL VERITY,

      Defendant-Appellant.

_____

Argued October 16, 2023—Decided November 16, 2023

Before Judges Sabatino, Mawla, and Chase (Judge Sabatino concurring).

On appeal from the Superior Court of New Jersey, Law Division, Cape May County, Indictment No 19-06-0291.

Tamar Yael Lerer, Assistant Deputy Public Defender, argued the cause for appellant Christopher R. Small (Joseph E. Krakora, Public Defender, attorney; Tamar Yael Lerer, of counsel and on the briefs).

Andrew Robert Burroughs, Designated Counsel, argued the cause for appellant Christopher M. Verity (Joseph E. Krakora, Public Defender, attorney; Andrew Robert Burroughs, on the briefs).

Gretchen Anderson Pickering, Senior Assistant Prosecutor, argued the cause for respondent (Jeffrey H. Sutherland, Cape May County Prosecutor, attorney; Gretchen Anderson Pickering, of counsel and on the briefs).

PER CURIAM

In these back-to-back appeals, defendants Christopher M. Verity and Christopher R. Small challenge their convictions and sentences for causing a drug-induced death and other controlled dangerous substance (CDS) offenses. We affirm in part and reverse and remand in part for the reasons expressed in this opinion.

On October 3, 2018, J.C., a retired nurse, was driving north in Dennis Township when she saw a man walking from a van parked on the side of the road. She asked the man, whom she identified in court as Verity, whether he needed a ride and Verity said he did. J.C. then drove Verity south and dropped him off.

J.C. then drove back north on the same road and passed the van again and noticed a man, later identified as Jan McCurdy, slumped over the steering wheel. She pulled over, walked to the van, and noticed McCurdy's face was discolored and had froth coming out of it. She called 9-1-1 and administered CPR. J.C. also noticed another man lying down with his head partially under the driver's seat. This individual, later identified as Kevin MacFarlane, was not breathing.

New Jersey State Trooper Brian McGinn arrived at the scene and did not find any drug paraphernalia in the van. EMT John Sharp arrived and unsuccessfully attempted to resuscitate MacFarlane who was later pronounced dead at the hospital. McCurdy was administered Narcan, revived, and taken to the hospital.

State Police Detective Kenneth Drake was the lead detective. He testified he arrived at the scene shortly after MacFarlane was pronounced dead. After interviewing J.C., Detective Drake visited Verity's residence and noticed a

needle, which contained fentanyl, and Verity appeared to be intoxicated. Police brought Verity back to State Police barracks for an interview. Detective Drake and Trooper Grant Stambaugh conducted the first interview on October 3, 2018, which was videoed and played for the jury.

Having been placed in custody, Verity was properly read his Miranda rights, which he promptly waived before he was questioned.[1] He stated he called McCurdy to ask for a ride to a convenience store to buy cigarettes. When McCurdy arrived to pick up Verity, McCurdy had MacFarlane with him. Verity did not know MacFarlane. Verity stated as they drove to the convenience store McCurdy and MacFarlane appeared to be intoxicated. On the way back from the store, McCurdy was driving erratically and had driven through a red light. Thereafter, Verity exited the van and walked about 200 feet before J.C. offered to give him a ride. Verity denied that drugs were "being done" in the car, claimed he did not see MacFarlane and McCurdy doing drugs, and denied selling both men drugs. Verity admitted he had a heroin problem and had ingested heroin that morning.

Detective Drake and Trooper Stambaugh told Verity they did not believe him. When Detective Drake informed Verity one of the men had survived,

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-2255-19

Verity stated he was told both men were dead. After correcting Verity, Detective Drake stated:

> I don't want to have to put words in your mouth about what the truth is. 'Cause the truth is . . . you're not telling us the truth right now because you're scared and I understand that and a normal person would be scared of this. We aren't here to get you in trouble for the guy that died in the car we are here . . . .
>
> [Trooper] Stambaugh: We're just trying to find out the truth.

Detective Drake and Trooper Stambaugh told Verity his story did not make any sense and then the detective stated:

> I want to tell you right now you are not really . . . in any trouble with us. However, if you keep lying to us and we keep uncovering things that you're lying about I'm going to make it my priority to make sure you are in trouble, but as of right now I'm goin' to tell you right now you are not in trouble with us, ok?

The detective reiterated he had "a pretty good idea why [MacFarlane] died . . . because there was a person across the street that saw the interaction" and McCurdy was alive and told police his version of the story, which did not align with Verity's.

As the interview progressed, Detective Drake assured Verity he and the trooper were not there "to put [Verity] in jail for some dead bodies . . . ." Later, Detective Drake said:

5

I'm not really here to jam you up . . . . I know you don't believe that, we're really not lookin' to put you in jail we're looking to figure out why.

Verity: I'm already in trouble because I have paraphernalia shit sittin' out.

[Trooper] Stambaugh: Right and if you want to keep it at that we need to know.

There was a break in the interview and, when it resumed, police read defendant his <u>Miranda</u> rights again. State Police Detective Desirae Kramer joined in the interview and showed Verity security tape from the convenience store. Verity recounted his story and stated on the drive back from the store, McCurdy was driving but then both McCurdy and MacFarlane began nodding off. Verity grabbed the wheel and hit the brakes. When McCurdy awoke, he told Verity to get out of the vehicle and Verity complied. Verity denied providing drugs to McCurdy and MacFarlane or seeing them use drugs.

Police interviewed Verity a second time on the evening of October 3, 2018. Verity was read his <u>Miranda</u> rights and signed a form acknowledging his rights. He then agreed to let the police listen to recordings he made his phone of his conversation with McCurdy prior to being picked up to go to the convenience store.

A-2255-19

Verity stated McCurdy called Verity that day asking if he could obtain heroin. Verity took McCurdy's and MacFarlane's money and bought them each "two wax folds" at five dollars per fold and purchased marijuana for himself. Verity purchased the drugs from "his guy" who, according to Verity, was upset Verity had come with two other individuals. Verity used McCurdy's phone to contact the seller because his phone had died.

A day later, Detective Drake obtained surveillance footage showing Verity, McCurdy, and MacFarlane arriving at the seller's location, a motel, in a vehicle matching the one MacFarlane and McCurdy were later found in. The video showed Verity leaving the vehicle and then returning. Small was the seller. He was arrested on October 5, 2018. After conducting a search incident to Small's arrest, blue wax folds, a scale, and baggies were found in his motel room.

Police interviewed Verity a third time on October 22, 2018, and showed him the surveillance video. He was read his <u>Miranda</u> rights on this date and signed an acknowledgment. He confirmed he was the one who exited the vehicle to meet the seller. Verity stated he believed the two wax folds he obtained for McCurdy and MacFarlane contained heroin. At one point, Verity asked the officers, "[h]ow many more deaths have you guys had?" Detective Drake replied

"[a]fter this one, there was one that night, but there hasn't been any since really." Verity responded, "So, I helped take out the killer." He offered to help police "catch more people."

A Cape May grand jury indicted Small and Verity with first-degree drug-induced death, N.J.S.A. 2C:35-5(a) and N.J.S.A. 2C:35-9(a), (counts one and two); third-degree distribution of fentanyl, less than one ounce, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(5) (counts three and four); third-degree conspiracy to distribute a CDS, N.J.S.A. 2C:35-5(a)(1), N.J.S.A. 2C:35-5(b)(5) and N.J.S.A. 2C:5-2(a)(1) (count five). Verity was also indicted on two counts of third-degree endangering an injured victim, N.J.S.A. 2C:12-1.2(a) (counts six and seven).

Verity moved to suppress his statements to the police.[2] Detective Drake testified at the hearing Verity never invoked his right to remain silent or requested an attorney. The detective testified Verity was being questioned as part of the investigation of the overdose death and "at the time, he wasn't charged" regarding the death. He was seeking information from Verity about the incident and to gauge the level of his involvement because he was in the

---

[2]  At the suppression hearing, defense counsel clarified he was seeking to suppress the October 3, 2018 statement.

vehicle. Detective Drake explained he told Verity he was not in trouble because he believed the seller was responsible and Verity "was a witness more than anything else." The detective stated he was not lying to Verity when he assured him both times that he was not in trouble. According to Detective Drake, it was not until after the initial interview when he listened to the conversations recorded on Verity's phone that he realized Verity played a larger role.

The motion judge denied Verity's suppression motion because he found Detective Drake's testimony credible. The judge noted police did not charge Verity until over a month after the initial interview. He concluded police did not mislead Verity into a confession.

Defendants were tried together. The State presented the testimony of fourteen witnesses, including: J.C.; McCurdy; Trooper Stambaugh; Detectives Drake and Kramer; Ralph Gagliano, an expert forensic toxicologist; and Dr. Frederick DiCarlo, an expert forensic pathologist. Verity and Small each testified in their own defense.

J.C. described her encounter with Verity and later discovery of McCurdy and MacFarlane in the vehicle. Detective Drake recounted the investigation and testified as an expert in drug lingo. He explained heroin and fentanyl are typically sold in wax folds commonly known as bags. Verity's phone-recorded

conversations were admitted into evidence, and he was heard asking for two

"whole ones" and for "diesel." Detective Drake explained "whole ones" meant

ten folds of heroin.

Verity's defense counsel cross-examined Detective Drake regarding the

assurances he gave Verity during the interview. The following colloquy ensued:

> [Defense counsel:] When you are dealing with a
> defendant in police headquarters is there any police
> obligation that you be truthful to them?
>
> [Detective Drake:] Absolutely not.
>
> [Defense counsel:] When . . . Verity is looking for
> reassurances that everything was okay, is that a normal
> practice to go along with that?
>
> [Detective Drake:] It is a normal practice. It's a tactic
> to get the truth out of the person that you're
> interviewing.

Detective Kramer testified regarding her role in the investigation. On

direct, she explained that during investigations, police lie to defendants to find

out the truth. During cross-examination the following colloquy ensued:

> [Defense counsel:] Now, when you talked to [Verity],
> he wasn't forthcoming at first, was he?
>
> [Detective Kramer:] He was not.
>
> [Defense counsel:] . . . [W]hen you were questioning
> him and when Detective Drake is in there with you,
> were you two being truthful with him at that time?

10

[Detective Kramer:]  At which point?

[Defense counsel:]  Any part of the video.  Were you being truthful or was everything you were saying a lie?

[Detective Kramer:]  I was being truthful.

. . . .

[Defense counsel:]  So when Detective Drake was telling [Verity] that he wasn't in trouble, that was the truth, correct?

[Detective Kramer:]  That was not.  No.

[Defense counsel:]  That was a lie?

[Detective Kramer:]  That part was, yes.

Gagliano testified MacFarlane's blood had 11.2 micrograms of fentanyl per liter and an alcohol level of 0.023 percent.  He explained anything above 3.0 micrograms per liter of fentanyl is considered fatal and the alcohol level was minimal.

Dr. DiCarlo testified he did not perform the autopsy but wrote a report based on the toxicology and autopsy reports.  He concluded the cause of MacFarlane's death was acute intoxication due to the toxic effects of fentanyl and alcohol.  The presence of fentanyl was at a high lethal level.  Heroin was not reported, and it would have been detected in the toxicology report if MacFarlane had been a regular heroin user.

A-2255-19

McCurdy testified he and MacFarlane wanted to buy drugs. He called Verity, a co-worker of his, who had told him he could assist him if he ever needed to buy drugs. McCurdy told Verity they were "looking for some weed and some cocaine, primarily weed." Verity told McCurdy to pick him up at his house and he would get them drugs. After McCurdy and MacFarlane picked up Verity in McCurdy's vehicle they traveled to the motel. After leaving the motel, McCurdy snorted what he believed to be cocaine when the van reached a stop sign. The next thing he remembered he was waking up in the hospital.

Verity testified McCurdy called him asking if he could buy some heroin. He told McCurdy to pick him up at his home and McCurdy, MacFarlane, and Verity drove to the motel to pick up drugs. McCurdy and MacFarlane gave Verity money and they each bought two bags of heroin and Verity bought marijuana for himself. During cross-examination, Verity explained he paid for the marijuana with his money but received two "free bags" of heroin based on the money McCurdy and MacFarlane had given him. As they headed back towards Verity's home, all three men snorted the heroin. When Verity noticed McCurdy failed to proceed through a green light and was nodding off, he pushed the gas pedal with his hand and steered the vehicle to the side of the road. Not

12

wanting to get into trouble, Verity exited the van and was driven home by J.C. Verity's video statements to police were played for the jury.

Small testified he was a long-time friend of Verity. He stated Verity called him to purchase marijuana. He denied selling heroin or fentanyl to Verity and claimed Verity "pulled out two . . . white bags" while he was in Small's room. After Small's arrest, a search of his room yielded multiple empty blue wax folds and a black scale; no drugs were found. The State adduced cellphone records showing multiple calls from Verity to Small on the day of MacFarlane's death.

The jury convicted Small on counts one, three, and five. The trial judge denied Small's motion for judgment notwithstanding the verdict, which argued the State failed to prove he knowingly and purposely distributed fentanyl. Small was sentenced to twenty years' imprisonment on count one and a consecutive five-year term on count three. Count five was merged into count one.

Verity was convicted on counts two, five, six, and seven, and acquitted on count four. He was sentenced to a ten-year term on count two, a concurrent three-year term on count five, and three-year terms on counts six and seven, which were concurrent to each other but consecutive to count two. Verity received an aggregate sentence of thirteen years, with eight-and-one-half years

of parole ineligibility subject to the No Early Release Act, N.J.S.A. 2C:43-7.2(d)(7).

Verity moved for a judgment of acquittal and alternatively for a new trial. He argued because the State failed to prove he intended to distribute fentanyl he could not be liable for causing MacFarlane's drug-induced death. The trial judge denied the motion.

On appeal, Verity raises the following points:

> POINT I    AS DEFENDANT WAS MISLED AS TO THE CONSEQUENCES OF PROVIDING A STATEMENT, THE WAIVER OF HIS MIRANDA RIGHTS WAS NOT VOLUNTARILY, KNOWINGLY, AND INTELLIGENTLY MADE.
>
> POINT II THE TRIAL COURT DENIED DEFENDANT HIS CONFRONTATION RIGHTS WHEN IT ALLOWED ANOTHER EXPERT TO TESTIFY IN PLACE OF THE FORENSIC PATHOLOGIST WHO HAD PERFORMED THE ORIGINAL AUTOPSY WHEN THAT PATHOLOGIST WAS LESS THAN [SIXTY] MILES AWAY AND AVAILABLE TO TESTIFY.
>
> POINT III THE TRIAL COURT COMMITTED PLAIN ERROR BY PROVIDING THE JURY WITH CONFUSING AND FAULTY JURY CHARGES. (Not Raised Below).
>
> POINT IV  THE TRIAL COURT ERRED WHEN IT ALLOWED A STATE WITNESS TO TESTIFY TO THE CONTENTS OF AN ALLEGED LETTER

A-2255-19

WRITTEN BY . . . SMALL TO THE PROSECUTOR'S OFFICE WITHOUT PROPER AUTHENTICATION.

POINT V    THE TRIAL COURT ERRED WHEN IT OVERRULED DEFENDANT'S OBJECTION WHERE THE STATE WAS ALLOWED TO IMPROPERLY QUESTION HIM ABOUT THE LEGAL MEANING OF SHARING AND DISTRIBUTION.

POINT VI    THE TRIAL COURT'S INTERRUPTION OF TRIAL COUNSEL'S CLOSING REMARKS WITH AN ERRONEOUS INSTRUCTION TO THE JURY AND ITS FAILURE TO PROVIDE A TIMELY CURATIVE INSTRUCTION WAS PREJUDICIAL.

POINT VII AS    THE    ILLOGICAL    AND IRRATIONAL VERDICT WAS THE PRODUCT OF CONFUSING    AND    ERRONEOUS    JURY INSTRUCTIONS, A NEW TRIAL IS REQUIRED. (Partially Raised Below).

POINT VIII    AS THE TRIAL COURT ITSELF ACKNOWLEDGED THAT DEFENDANT WAS SHARING THE SUPPOSED HEROIN WITH HIS FRIENDS, IT ERRED WHEN IT FAILED TO SUA SPONTE INSTRUCT THE JURY ON "SHARING." (Not Raised Below).

POINT IX    THE TRIAL COURT ERRED WHEN IT DID NOT SUA SPONTE INSTRUCT THE JURY ON MISTAKE OF FACT.  (Not Raised Below).

POINT X    AS THE STATE FAILED TO PRESENT ANY    EVIDENCE    BEYOND    A    SIMPLE AGREEMENT TO BUY/SELL DRUGS BETWEEN DEFENDANTS, A JUDGMENT OF ACQUITTAL MUST BE ENTERED ON CONSPIRACY TO DISTRIBUTE CDS.  (Not Raised Below).

A-2255-19

POINT XI THE TRIAL COURT'S CUMULATIVE ERRORS DENIED DEFENDANT A FAIR TRIAL. (Not Raised Below).

POINT XII THE PROSECUTOR'S EXHORTATION THAT THE JURY MUST CONVICT DEFENDANT DENIED HIM A FAIR TRIAL. (Not Raised Below).

POINT XIII TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO ASK THE TRIAL COURT TO INSTRUCT THE JURY ON MISTAKE OF FACT. (Not Raised Below).

POINT XIV THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE. (Partially Raised Below).

Small raises the following points on his appeal:

POINT I THE INSTRUCTION ON STRICT-LIABILITY FOR DRUG-INDUCED DEATH WAS FATALLY FLAWED, REQUIRING REVERSAL OF THAT CONVICTION. (Not Raised Below).

POINT II THE ADMISSION OF THE CO-DEFENDANT'S NUMEROUS PRIOR CONSISTENT STATEMENTS AND OTHER HEARSAY INCULPATING DEFENDANT WAS IMPROPER AND REQUIRES REVERSAL. (Partially Raised Below).

POINT III INTRODUCTION OF EVIDENCE OF OTHER BAD ACTS AND DEFENDANT'S PRIOR CONVICTIONS WITHOUT ANY INSTRUCTION NECESSITATES REVERSAL OF DEFENDANT'S CONVICTIONS. (Partially Raised Below).

16

POINT IV    REPEATED                   PROSECUTORIAL
MISCONDUCT   REQUIRES   REVERSAL   OF
DEFENDANT'S CONVICTIONS.    (Not Raised
below).

POINT V  EVEN   IF   ANY   ONE   OF   THE
COMPLAINED-OF      ERRORS      WOULD      BE
INSUFFICIENT TO WARRANT REVERSAL, THE
CUMULATIVE EFFECT OF THOSE ERRORS WAS
TO DENY DEFENDANT DUE PROCESS AND A
FAIR TRIAL.  (Not Raised Below).

POINT VI  BECAUSE    NO    EVIDENCE    WAS
PRESENTED BEYOND A SIMPLE AGREEMENT
TO BUY DRUGS, A JUDGMENT OF ACQUITTAL
MUST  BE  ENTERED  ON  CONSPIRACY  TO
DISTRIBUTE DRUGS.  (Not Raised Below).

POINT VII THE TRIAL COURT MADE A NUMBER
OF   ERRORS   IN   FINDING   AND   WEIGHING
AGGRAVATING  AND  MITIGATING  FACTORS
AND  INAPPROPRIATELY  RAN  TWO  COUNTS
CONSECUTIVELY,    RESULTING    IN    AN
EXCESSIVE SENTENCE.

## I.

Verity argues the judge erred in finding his <u>Miranda</u> rights waiver prior to

the initial statement was voluntary, knowing, and intelligent.  He asserts the

police repeatedly told him he was not in trouble and was only going to be

charged with possession of CDS, which negated the waiver.

To admit a statement obtained during a custodial interrogation "the State

must 'prove beyond a reasonable doubt that the suspect's waiver was knowing,

17

intelligent, and voluntary in light of all the circumstances.'" State v. Tillery, 238 N.J. 293, 316 (2019) (quoting State v. Presha, 163 N.J. 304, 313 (2000)). The court considers factors including the defendant's "age, education, intelligence, previous encounters with law enforcement, advice received about [their] constitutional rights, the length of detention, the period of time between administration of the warnings and the volunteered statement, and whether the questioning was repeated and prolonged in nature or involved physical or mental abuse." State v. Timmendequas, 161 N.J. 515, 614 (1999).

A waiver of a defendant's Miranda rights must not be the product of police coercion but instead must be knowing, intelligent and voluntary based on "the totality of the circumstances surrounding the custodial interrogation . . . ." State v. A.M., 237 N.J. 384, 398 (2019). The evidence must establish beyond a reasonable doubt the statement was given voluntarily and not because the defendant's will was overborne. State v. Knight, 183 N.J. 449, 462 (2005).

Generally, on appellate review, a trial court's factual findings on a motion to suppress a defendant's statement to the police will be upheld when they are supported by sufficient credible evidence in the record. State v. S.S., 229 N.J. 360, 374 (2017). We do not disturb the motion court's factual findings unless those findings are so clearly mistaken as to demand intervention in the interests

of justice.  Ibid.  However, we owe no deference to the motion court's conclusions of law, which are reviewed de novo.  A.M., 237 N.J. at 396.

New Jersey affords interrogees additional rights beyond those guaranteed by the United States Constitution.  State v. Diaz, 470 N.J. Super. 495, 514 (App. Div.), leave to appeal denied, 251 N.J. 8 (2022).  Thus, for a waiver of rights to be knowing and intelligent, police must inform an interrogee that a criminal complaint has been filed or an arrest warrant issued, State v. A.G.D., 178 N.J. 56, 68-69 (2003), and the nature and seriousness of the charges that have been filed.  State v. Vincenty, 237 N.J. 122, 134 (2019).

Nonetheless, during a custodial interrogation, an officer may use trickery or deceit regarding the investigation without violating a defendant's right against self-incrimination.  State v. Patton, 362 N.J. Super. 16, 29-31 (App. Div. 2003). Misrepresentations by police officers alone are usually insufficient to justify a determination of involuntariness or lack of knowledge unless the misrepresentation induced the confession.  State v. Cooper, 151 N.J. 326, 355 (1997).  See also State v. Baylor, 423 N.J. Super. 578, 588-89 (App. Div. 2011) (no violation where the police's use of trickery "did not result in defendant making a statement he would not have otherwise made voluntarily.").  In State v. Manning, 165 N.J. Super. 19, 30-31 (App. Div. 1978), we upheld the

admission of a confession given after the police had lied by telling the defendant that a co-suspect had already confessed to the crime and implicated him. See also Frazier v. Cupp, 394 U.S. 731, 739 (1969) (holding confession was voluntary where police lied to the defendant that his co-defendant had implicated him in the crime).

Furthermore, our Supreme Court has held police are not required to inform a person of his suspect status in addition to his Miranda warnings. State v. Nyhammer, 197 N.J. 383, 406 (2009). Rather, "the failure to be told of one's suspect status . . . would be only one of many factors to be considered in the totality of the circumstances." Id. at 407. Miranda does not require that the police "supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak" or to remain silent because the additional information "could affect only the wisdom of a Miranda waiver, not its essentially voluntary and knowing nature." Ibid. (quoting Colorado v. Spring, 479 U.S. 564, 576-77 (1987)). Therefore, a valid waiver does not require that the person in custody be informed of all information that could be useful in making the decision to remain silent or to speak. Ibid.

Diaz involved a prosecution for drug-induced death where the defendant argued his custodial statements to the police should have been suppressed

because the police deliberately did not inform him about the overdose death. 470 N.J. Super. at 502. We held the police misled the defendant as to his "true status" when they gave a "deliberately vague and incomplete answer to his question as to the reason why he was taken into custody." Id. at 518. This "investigative stratagem" was intended to withhold information concerning the overdose death until after the defendant admitted that he had sold heroin to the decedent the day before. Ibid. "The reasonably likely if not intended effect of that artifice was to lead defendant—at the critical moment he waived his Fifth Amendment rights—to believe that he had been arrested for a less serious offense than strict liability homicide." Id. at 518-19. We added:

> It is one thing for police to withhold information. It is another thing entirely for them to provide an explanation that creates or reinforces a false impression as to the seriousness of the sentence that a defendant is facing. Any such deception or trickery as to the true reason a defendant is taken into custody . . . is an important circumstance to be considered as part of the totality of circumstances when determining whether the State has proved beyond a reasonable doubt that the defendant made a knowing and voluntary waiver of the right against self-incrimination.
>
> [Id. at 519.]

We concluded:

> the detectives were following a deliberate investigative strategy to withhold information about the overdose

death from defendant until after he admitted that he sold heroin to [a witness] the day before. . . . The interrogation strategy was designed to keep defendant from realizing that he faced possible prosecution for homicide . . . until after he had waived his right against self-incrimination and made incriminating admissions that would support a homicide prosecution.

[Id. at 522.]

Recently, our Supreme Court affirmed the suppression of a defendant's pre-Miranda statements where he was clearly in police custody and assured he was not in trouble. State v. Bullock, 253 N.J. 512, 538-39 (2023). The Court held the Miranda rights the officer read the defendant were deficient and the officer undermined those rights by telling defendant he was not in trouble. Id. at 539. The Court noted the circumstances clearly showed "defendant was in some peril" because he made statements about harming others. Ibid. Therefore, "[t]elling defendant that he was 'not in trouble' was an affirmative misrepresentation[,]" which under the totality of the circumstances invalidated "any waiver and agreement to speak to police . . . ." Ibid.

At the outset, Miranda rights were read to Verity before any questioning occurred. And there is no assertion the Miranda rights were lacking. Moreover, police did not give Verity a deliberately vague and incomplete answer to a question of why he was taken into custody. He was under arrest because of the

22

drug paraphernalia in his residence. Nor did they withhold information about the fact they were investigating a drug overdose death. In fact, they corrected Verity's misapprehension that both McCurdy and MacFarlane had died. Therefore, Diaz and Bullock are distinguishable.

In State v. Puryear, the interrogating officer told the defendant that "[t]he only thing you can possibly do here is help yourself out. You cannot get yourself in any more trouble than you're already in. You can only help yourself out here." 441 N.J. Super. 280, 288 (App. Div. 2015). We held the officer's comment neutralized the Miranda warnings that had been given and, as a result, the defendant's ensuing statement was held to be inadmissible. Id. at 298-99. We concluded the comment was not a "permissible interrogation technique." Id. at 298. See also State in the Int. of A.S., 203 N.J. 131, 151 (2010) (improper to tell suspect that answering questions "would actually benefit her").

Here, the officers did not tell Verity that he could not get himself in any more trouble and could only help himself if he spoke to them. The officers told Verity he was not in "trouble" as to the overdose death. This was true at the time, there is nothing in the record to indicate that at the time of the initial interview, Verity was under investigation for purchasing the drugs consumed by MacFarlane. Detective Kramer joined the interview later. Therefore, her

23

statement that police lied to defendant had no bearing on the portion of defendant's statement involving Detective Drake and Trooper Stambaugh. Verity made the most crucial inculpatory statements during his second and third interviews, both under Miranda, which occurred well after the initial interview. Therefore, Puryear is distinguishable.

Verity cites State v. L.H., 239 N.J. 22 (2019). There, the defendant was in custody on suspicion of sexual assault. Id. at 28. During the interrogation, the police officers repeatedly promised the defendant counseling and told him that he would not go to jail if he cooperated. Ibid. They also told him that "the truth would set him free." Ibid. The defendant eventually provided incriminating statements. Ibid. In affirming the suppression of the statements, the Court noted although officers have "leeway to tell some lies during an interrogation," certain lies "may have the capacity to overbear a suspect's will and to render a confession involuntary[,]" such as false promises of leniency. Id. at 44-45. Telling Verity that he was not a suspect in the overdose death did not have the potential to subvert his will in the manner in the manner L.H.'s will was subverted by the promise that he would not go to jail if he cooperated.

The totality of the circumstances show there was a valid Miranda warning, an ongoing investigation, and facts that were not misrepresented by police.

These circumstances and the fact Verity does not on appeal challenge any of the other factors in Timmendequas, 161 N.J. at 614, do not convince us his will was overborne. For these reasons, his statements were properly admitted.

II.

"[P]roper jury instructions are essential to a fair trial," and "'erroneous instructions on material points are presumed to' possess the capacity to unfairly prejudice the defendant." State v. McKinney, 223 N.J. 475, 495 (2015) (quoting State v. Bunch, 180 N.J. 534, 541-42 (2004)). When a defendant fails to object to the instruction at trial, Rule 1:7-2 provides that a showing of plain error must be made. "[P]lain error requires demonstration of '[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" State v. Burns, 192 N.J. 312, 341 (2007) (second alteration in original) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).

Where a defendant raises error in a jury instruction on appeal, the charge must be read as a whole. State v. Wilbely, 63 N.J. 420, 422 (1973). We do not consider just the allegedly erroneous portion. Ibid. All that is necessary is that

the overall instruction be accurate. State v. Thompson, 59 N.J. 396, 411 (1971); Borowicz v. Hood, 87 N.J. Super. 418, 423 (App. Div. 1965).

We review inconsistencies in jury verdicts to determine whether "there exists a sufficient evidential basis in the record to support the charge on which the defendant is convicted." State v. Banko, 182 N.J. 44, 46 (2004). "We accept inconsistent verdicts in our criminal justice system, understanding that jury verdicts may result from lenity, compromise, or even mistake." State v. Goodwin, 224 N.J. 102, 116 (2016) (citing Banko, 182 N.J. at 53). Our review determines only "whether the evidence in the record was sufficient to support a conviction on any count on which the jury found the defendant guilty." Ibid. (quoting State v. Muhammad, 182 N.J. 551, 578 (2005)).

Inconsistent jury verdicts are permissible so long as they remain supported by evidence within the record. Banko, 182 N.J. at 46. Courts should not speculate as to the reasons why a jury reaches a particular verdict. Id. at 54-55. However, where "inconsistent verdicts preclude the establishment of an element of the offense," such verdicts may be invalid. State v. Peterson, 181 N.J. Super. 261, 267 (App. Div. 1981). When considering whether a verdict is impermissibly inconsistent, "it is appropriate to consider the evidence in the light most favorable to the prosecution and to determine whether a rational trier

of fact could have found each element of the offense beyond a reasonable doubt." Id. at 267-68 (citing Jackson v. Virginia, 443 U.S. 307, 317-19 (1979)).

## A.

Small argues the trial judge erred by instructing the jury it could convict him and Verity for drug-induced death if they found either defendant had knowingly or purposely sold the fentanyl that killed MacFarlane. Verity raises the same argument and further asserts the faulty instruction lowered the State's burden of proof.

N.J.S.A. 2C:35-9(a) provides:

> Any person who manufactures, distributes or dispenses . . . any other controlled dangerous substance classified in Schedules I or II, or any controlled substance analog thereof, in violation of subsection [(a)] of N.J.S.[A.] 2C:35-5, is strictly liable for a death which results from the injection, inhalation or ingestion of that substance, and is guilty of a crime of the first degree.

Our Supreme Court has explained "[n]o criminal intent to cause death is required to establish culpability. A defendant may be found guilty under N.J.S.A. 2C:35-9 even if he 'has absolutely no idea that [death] may occur.'" State v. Ferguson, 238 N.J. 78, 95 (2019) (alteration in original) (quoting State v. Maldonado, 137 N.J. 536, 547 (1994)).

> In sum, the elements required to prove a violation of the strict-liability drug-induced death statute are (1)

27

the defendant "distributed" a [CDS]; (2) the defendant did so knowingly or purposely; (3) the victim used the substance distributed by the defendant; and (4) the victim died as a result of the use of the substance distributed by the defendant, "and the death was not too remote in its occurrence or too dependent upon the conduct of another person." Model Jury Charges (Criminal), "Strict Liability for Drug[-]Induced Deaths (N.J.S.A. 2C:35-9)" (approved Sept. 1997).

[Id. at 95-96.]

The trial judge instructed the jury on the drug-induced death counts, as follows:

Any person who distributes any other controlled dangerous substance classified as Schedule I or II is strictly liable for a death which results from the injection, inhalation or ingestion of that substance, and is guilty of a crime. The statute, read together with the indictment, identifies the elements which the State must prove beyond a reasonable doubt to establish the guilt of the defendants on these counts of the indictment.

The elements are that, [(1)], one or both of the defendants distributed fentanyl, which is classified as a Schedule II drug, [(2)], one or both of the defendants acted knowingly or purposely in distributing the fentanyl, [(3)], . . . [MacFarlane] inhaled or ingested fentanyl distributed by one or both of the defendants, and [(4)], . . . [MacFarlane] died as a result of inhaling or ingesting the fentanyl distributed by one or both of the defendants. That is, the defendant's act of distributing the fentanyl caused . . . [MacFarlane's] death.

[(Emphasis added).]

Though trial counsel did not object to the charge, we are convinced the jury instruction was clearly capable of producing an unjust result because the repeated use of the "one or both" language meant Small could have been convicted based solely on the jury finding Verity guilty of the charge and vice versa. Therefore, the jury was deprived of a means of considering and articulating the individual guilt of each defendant, namely who distributed the fentanyl and whether they did so knowingly or purposely. The model instruction for drug-induced death does not provide guidance on how it should be adapted for a seller-to-seller co-defendant, as is the case here. Model Jury Charges (Criminal), "Strict Liability for Drug-Induced Deaths (N.J.S.A. 2C:35-9)" (approved Sept. 1997). Unfortunately, the modified charge the court improvised here, containing the "one or both" language, provided the jury with an erroneous framework for analysis.

We acknowledge the jury verdict sheet did not lump defendants together regarding the strict liability offense. Further, we do not ignore the fact the judge later instructed the jury as follows:

> Each offense and each defendant in this indictment should be considered by you separately. The fact that you may find a particular defendant guilty or not guilty of a particular crime should not control your verdict as to any other offense charged against that

> defendant, and it should not control your verdict as to the charges against any other defendant.

However, we are unconvinced this instruction, which came at the end of the instructions for other offenses in addition to the strict liability offense, reversed the effect of the problematic and repeated use of the "one or both" in the strict liability instruction. Indeed, "[g]eneral jury instructions may not always sufficiently impart to a jury its responsibilities and limitations." Jordan, 147 N.J. at 428.

Defendants are entitled to a new trial solely on this ground. For these reasons, defendants' convictions on the strict liability offenses are reversed.

### B.

Small argues the conspiracy to distribute CDS conviction should be reversed because the evidence showed there was only an agreement to purchase CDS. He asserts the judge should have instructed the jury to consider whether he was engaged in a conspiracy or a simple buy-sell transaction. Verity raises a similar argument on his appeal.

"[A] simple agreement to buy drugs is insufficient to establish a conspiracy between the seller and the buyer." State v. Roldan, 314 N.J. Super. 173, 182 (App. Div. 1998). "However, when the evidence shows that two or more parties have entered into an agreement to engage in concerted criminal

activity which goes beyond the kind of simple agreement inevitably incident to the sale of contraband . . . the participants may be found guilty of conspiracy." Id. at 182-83. "The amount of drugs involved in a transaction also may give rise to an inference that each of the participants had to have been aware 'he was "a part of a venture which extended beyond his individual participation."'" Id. at 183 (quoting United States v. Prieskorn, 658 F.2d 631, 635 (8th Cir. 1981)).

The activity may take the form of a "chain conspiracy[,]" which involves individuals in addition to the buyer and seller. Id. at 181. "Under the chain analysis, the government need not prove a direct connection between all the conspirators." Id. at 182 (quoting United States v. Tarantino, 846 F.2d 1384, 1392 (D.C. Cir. 1988)).

The trial judge read the jury the following instruction regarding conspiracy:

> In order for you to find defendant guilty of the crime of conspiracy, the State must prove beyond a reasonable doubt the following elements, [(1)], that the defendant agreed with another person or persons that they or one or more of them would engage in conduct which constitutes a crime, [(2)], that the defendant's purpose was to promote or facilitate the commission of the crime of distribution of a [CDS].

Here, the agreement to buy drugs did not simply involve the two defendants. Verity sought out Small to purchase drugs not just for himself, but

also for MacFarlane and McCurdy. Moreover, there is evidence that Verity, in effect, was compensated for his services to McCurdy and MacFarlane and "[o]ff of what [he] charged there was extra bags" of heroin for him. The amount of the drugs sold, and that Verity stated he had separately purchased both heroin and marijuana from Small, supports the conclusion Small knew there were others involved in the transaction beyond Verity. Further, Small knew Verity had come to the motel with other individuals because Small was unhappy about it. The evidence established a chain conspiracy and did not support a simple buy-sell transaction. The conspiracy charge was accurate.

C.

Verity claims the trial judge erred by not sua sponte charging the jury that it could find he was sharing the CDS with MacFarlane and McCurdy rather than engaging in distribution. And since distribution is an element of N.J.S.A. 2C:35-9, Verity maintains his conviction for that offense should be reversed. Verity also contends the court erred by not sua sponte instructing the jury on the defense of mistake of fact pursuant to N.J.S.A. 2C:2-4(a) to the strict liability and the conspiracy charges because he believed he had purchased heroin when in fact the drug was fentanyl. He asserts trial counsel was ineffective for not requesting a curative instruction on the mistake of fact.

"[I]f the parties do not request a lesser-included-offense charge, reviewing courts 'apply a higher standard, requiring the unrequested charge to be "clearly indicated" from the record.'" State v. Fowler, 239 N.J. 171, 188 (2019) (quoting State v. Alexander, 233 N.J. 132, 143 (2018)); see also State v. Denofa, 187 N.J. 24, 42 (2006); N.J.S.A. 2C:1-8(e).

> The "clearly indicated" standard does not require trial courts either to "scour the statutes to determine if there are some uncharged offenses of which the defendant may be guilty," . . . or "to meticulously sift through the entire record . . . to see if some combination of facts and inferences might rationally sustain' a lesser charge" . . . . Instead, the evidence supporting a lesser-included charge must "jump[] off the page" to trigger a trial court's duty to sua sponte instruct a jury on that charge.
>
> [Alexander, 233 N.J. at 143 (third and fifth alterations in original) (citations omitted).]

i.

Where "'two individuals simultaneously and jointly acquire possession of a drug for their own use, intending only to share it together,' they have not committed distribution" under N.J.S.A. 2C:35-5. State v. Morrison, 188 N.J. 2, 18 (2006). The record does not clearly indicate Verity, MacFarlane, and McCurdy simultaneously and jointly acquired the CDS. At best, the record shows Verity acted as a middleman between Small and McCurdy and

33

MacFarlane. When McCurdy inquired about procuring the drugs, Verity said he could contact "his guy." He then went to Small's room, purchased the drugs with McCurdy and MacFarlane's money, which was separate from his own, and charged a commission by retaining two bags of heroin that the McCurdy/MacFarlane money funded.

ii.

Under N.J.S.A. 2C:2-4(a), "ignorance or mistake as to a matter of fact" is a defense if the defendant "reasonably arrived at the conclusion underlying the mistake" and either the mistake "negatives the culpable mental state required to establish the offense," or "[t]he law provides that the state of mind established by such ignorance or mistake constitutes a defense."

In State v. Edwards, 257 N.J. Super. 1, 3-4 (App. Div. 1992), the defendant argued the trial judge should have sua sponte charged the jury on mistake of fact because she believed that she was in possession of hashish when it turned out the CDS was cocaine. We found no plain error because the nature of the CDS was not an element of the offense. Id. at 4. "In such circumstances the State must prove that the defendant knew that she possessed a [CDS]. It does not have to prove that a defendant knew precisely what [CDS] was possessed." Ibid.

34

Here, heroin and fentanyl are Schedule I and II drugs. N.J.S.A. 24:21-5 and -6. Any person who distributes a Schedule I or II drug may be held liable for a drug-induced death under N.J.S.A. 2C:35-9(a). Therefore, it did not matter whether Verity thought he had purchased heroin or fentanyl. The same is true for conspiracy to distribute a CDS, N.J.S.A. 2C:35-5(a)(1), N.J.S.A. 2C:35-5(b)(5) and N.J.S.A. 2C:5-2(a)(1). The trial judge did not err.

### iii.

Claims attacking trial counsel's assistance "are particularly suited for post-conviction review because they often cannot reasonably be raised in a prior proceeding." State v. Preciose, 129 N.J. 451, 460 (1992). "Our courts have expressed a general policy against entertaining ineffective-assistance-of-counsel claims on direct appeal because such claims involve allegations and evidence that lie outside the trial record." Ibid.

Verity's claims of ineffective assistance of trial counsel implicate potential strategic decisions by counsel about whether to seek an instruction on mistake of fact. We cannot assess this claim on appeal because the record is not "adequately developed" to help us understand why counsel did not seek an instruction. State v. Castagna, 187 N.J. 293, 313 (2006) (citing State v. Allah, 170 N.J. 269, 285 (2002)). Although we express no view on the merits, this

claim is better reserved for a petition for post-conviction relief.

III.

Verity argues he is entitled to a new trial because his acquittal for third-degree distribution of fentanyl and conviction on the first-degree causing a drug-induced death are fatally inconsistent. He maintains the judge erred in not granting his motion for a judgment of acquittal on this basis.

Although we have reversed Verity's strict liability conviction, we address this argument for the sake of completeness. In denying Verity's motion for a judgment notwithstanding the verdict, the judge agreed Verity "is correct that there is at face value a logical inconsistency with respect to the jury's verdict." However, the judge found there was sufficient evidence to support each charge. With respect to the distribution predicate of the drug-induced death count, the judge concluded:

> The narrative which develops herein indicates that the victims wanted . . . Verity to provide CDS to them, and [he] provided CDS to them. This evidence provides the inference that . . . Verity did possess CDS and intended to provide the victims with the CDS (a "distribution event"). Accordingly, construing this evidence in the light most favorable to the State, there was sufficient evidence to support a finding, beyond a reasonable doubt, of the factual predicate of possession (with intent to distribute) and [the] distribution at issue.

In reviewing a post-trial motion for a judgment of acquittal or a motion for a new trial, the motion judge may consider all the evidence presented, direct or circumstantial, giving the State the benefit of all the favorable evidence and all the favorable inferences drawn from the evidence, and then determine whether the jury could find guilt beyond a reasonable doubt. State v. Williams, 218 N.J. 576, 594 (2014). A motion for a new trial based on the weight of the evidence may be granted in the interests of justice if the evidence "clearly and convincingly appears that there was a manifest denial of justice under the law." R. 3:20-1.

We review such rulings de novo, applying the same standard as the trial judge to determine if a judgment of acquittal was warranted. Williams, 218 N.J. at 593-94; State v. Felsen, 383 N.J. Super. 154, 159 (App. Div. 2006). However, we defer to the trial court's credibility determinations and its "feel of the case." State v. Gaikwad, 349 N.J. Super. 62, 82-83 (App. Div. 2002).

Inconsistent verdicts are permissible so long as the evidence is sufficient to establish guilt on the convicted offense. Banko, 182 N.J. at 53-55. Such verdicts may be the result of compromise or jury nullification, which is beyond the power of a court to prevent. Id. at 54. Thus, "even verdicts that acquit on a predicate offense while convicting on the compound offense" need not

"necessarily be interpreted as a windfall" to the prosecution.  Ibid. (quoting United States v. Powell, 469 U.S. 57, 65 (1984)).  Each count should be treated as if it were a separate indictment.  Id. at 53.

There was ample evidence presented to support the drug-induced death conviction.  As we noted, there was testimony that:  Verity purchased a Schedule I or Schedule II drug from Small; gave the drug to MacFarlane; and MacFarlane ingested the drug.  Why the jury acquitted Verity on the distribution count is not an issue we need address because the acquittal was not fatal to the charge, which resulted in a conviction.  State v. Grey, 147 N.J. 4, 11 (1996).

IV.

Verity argues the trial judge violated his right of confrontation by allowing DiCarlo to testify as an expert witness instead of the pathologist who performed the autopsy of MacFarlane.  He claims the judge erred by permitting testimony regarding a letter Small had sent to the prosecutor about a meeting with Verity without proper authentication.  Further, Verity argues the prosecutor's repeated questioning of Verity regarding his understanding of the terms "sharing" and "distribution" of CDS despite the judge's admonition otherwise was improper.  Verity asserts the judge should have stricken the entire line of questioning.

Small maintains he was denied a fair trial because the judge permitted the State to introduce prior consistent statements to bolster Verity's testimony that Small had sold him drugs even though there had been no challenge to Verity's testimony as fabricated. Further, the court erroneously admitted Verity's phone calls during Small's cross-examination. Small argues the judge improperly admitted prior bad act evidence and failed to give a limiting instruction when evidence of his prior convictions was introduced.

We review a trial judge's decision to admit or exclude evidence for an abuse of discretion. State v. Terrell, 452 N.J. Super. 226, 248 (App. Div. 2016). Considerable latitude is afforded the trial judge's evidentiary determinations. State v. Kuropchak, 221 N.J. 368, 385 (2015). The admission of expert testimony also rests in the sound discretion of the trial judge and will not be reversed absent a clear abuse of that discretion. State v. Free, 351 N.J. Super. 203, 221 (App. Div. 2002).

A.

At trial, Verity objected to DiCarlo's testimony on confrontation grounds because the forensic pathologist who performed the autopsy was available and the State could have her testify. However, the prosecutor asserted the pathologist who prepared the report was now out of state and claimed that

witness was beyond the State's subpoena power. The judge ruled DiCarlo could testify because he had "engaged in a sufficient independent analysis of [the] evidence" to support his conclusions. We discern no error.

In State v. Roach, 219 N.J. 58, 79-80 (2014), the Court rejected a Confrontation Clause argument holding a co-worker of an analyst who performed DNA testing in the case could testify in their colleague's stead. The Court conditioned the testimony on whether the witness was "a truly independent and qualified reviewer of the underlying data and report" and did not "merely parrot the findings of another." Id. at 79. The testimony was deemed admissible because the witness explained how she used her scientific expertise and knowledge to independently review the DNA data generated by the unavailable analyst. Id. at 81, 83.

In State v. Bass, the Court held an assistant medical examiner could not testify regarding an autopsy report prepared by a fellow medical examiner who had died where the assistant had only reviewed the autopsy report and agreed with its conclusions regarding the manner of death. 224 N.J. 285, 317-18 (2016). The Court held the State could not ask whether the examiner agreed with the autopsy report because this improperly "parrot[ed]" the report and violated the defendant's confrontation rights. Id. at 318-19.

Here, Dr. DiCarlo prepared his own report based on his independent review of the initial autopsy report and Gagliano's toxicology report. This satisfied the concerns raised in <u>Roach</u> and <u>Bass</u> and the judge did not abuse his discretion.

B.

The State called a Cape May Prosecutor's Office detective who testified that on September 6, 2019, his office received a letter from Small dated September 4, 2019, in which Small stated he met with Verity on "the day in question." Prior to and after the testimony defendants objected based on lack of authentication. Small's attorney then cross-examined the witness as to how he knew the letter came from Small. The witness replied the letter had Small's name at the bottom. Small's attorney also inquired whether the letter indicated the time Small and Verity met. The witness said it did not.

Under N.J.R.E. 901, to satisfy "the requirement of authenticating or identifying an item of evidence, the proponent must present evidence sufficient to support a finding that the item is what its proponent claims." This rule does not require "absolute certainty or conclusive proof." <u>State v. Mays</u>, 321 N.J. Super. 619, 628 (App. Div. 1999). Courts generally play the role of screener, leaving to the jury a more intense review of the evidence. <u>Konop v. Rosen</u>, 425

N.J. Super. 391, 411 (App. Div. 2012).

There is no indication the letter was admitted into evidence. Regardless, some of its contents were revealed to the jury at a point in time where it was not clear Small would testify because the State had not rested. However, neither the testimony nor the failure to authenticate the letter constituted reversible error because we are unconvinced the limited information revealed in this instance, as compared to the totality of the evidence presented, was clearly capable of an unjust result.

C.

During cross-examination, the prosecutor asked Verity whether he understood the difference between possession and distribution. Verity said that he did not, and his counsel objected on grounds the State was asking Verity legal questions. The judge permitted the prosecutor to rephrase the question and Verity answered that to "possess something it would be in your pocket," and to distribute something would be trying to make a profit from the pocket's contents.

When the prosecutor asked whether handing one of his detectives a cough drop constituted sharing, defense counsel renewed his objection. The prosecutor then asked Verity whether during his interviews he had ever used the word sharing. Verity responded he did not use the word at that time and trial was the

42

first time he referred to sharing. When defense counsel objected, the prosecutor withdrew the question, and the judge told the jury to disregard the question. The judge denied defense counsel's request to strike the entire line of questioning.

The trial judge controls the scope of cross-examination. N.J.R.E. 611(b). We typically will not interfere with a judge's authority to control the scope of cross-examination unless clear error and prejudice are shown. Gaikwad, 349 N.J. Super. at 87.

Verity claims this line of cross-examination denied him a fair trial because the judge permitted the State to ask legal questions and Verity was a fact witness. Although the questioning was irrelevant to Verity's role as a witness, it was not plain error because it did not clearly lead to an unjust result. The jury acquitted Verity of distribution.

## D.

During cross-examination, Verity testified Small had been his drug supplier. He also said he was not sure the story he told police that, during the drive back from purchasing the drugs, McCurdy suddenly started "acting weird" was true and a replay of his interview would refresh his memory.

The State argued because Verity's testimony had satisfied Small's right to confrontation, it intended to play portions of Verity's statements that implicated

Small, which had previously redacted Small's name. The trial judge asked defense counsel whether they had an objection to the State introducing the non-redacted videos and both did not. Small now challenges the admission of this evidence.

Under the doctrine of invited error, alleged trial errors that were acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal. State v. Harper, 128 N.J. Super. 270, 277 (App. Div. 1974). For these reasons, we discern no reversible error on this issue.

E.

During Small's cross-examination, the State wanted to play a recorded conversation between Small and Verity that took place on September 24, 2018, to refresh Small's memory. Small objected because there was no evidence showing where the call originated. The judge permitted the State to refresh Small's memory and noted the conversation was already in evidence in written form.

The State played the recording and the jury heard Verity ask Small if he had any "ice cream." Verity also said he would "take a Big Boy." Detective Drake had already explained these were both drug references. Small claimed the recordings did not refresh his recollection.

Small argues this evidence was inadmissible hearsay used to improperly bolster the State's theory of his culpability. We are unpersuaded.

N.J.R.E. 803(b)(5) governs the co-conspirator exception to hearsay. The exception permits the admission of an out of court statement where it was made "in furtherance of the conspiracy," was made "during the course of the conspiracy," and there is "evidence independent of the hearsay of the existence of the conspiracy and the defendant's relationship to it." State v. Savage, 172 N.J. 374, 402 (2002) (quoting State v. Phelps, 96 N.J. 500, 509-10 (1984)).

We discern no reversible error in this instance. Small was charged with conspiracy to distribute CDS, and the conversations in question took place within two weeks of MacFarlane's death and involved the purchase of drugs. Moreover, independent of these conversations, the State adduced other testimony showing the drugs were purchased on October 3, 2018, and Small's role in the sale and distribution.

## F.

Small argues the court improperly admitted multiple pieces of evidence of his prior bad acts. He asserts the evidence had no purpose because it was not used to impeach him.

Under N.J.R.E. 404(b)(1), "evidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition." The evidence is admissible for other purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. . . ." N.J.R.E. 404(b)(2).

The party seeking to introduce the evidence must satisfy a four-prong test under State v. Cofield, 127 N.J. 328 (1992). A prior bad act is admissible if: (1) it is "relevant to a material issue"; (2) the prior act is "similar in kind and reasonably close in time to the offense charged"; (3) the evidence of the prior act is clear and convincing; and (4) its probative value is not "outweighed by its apparent prejudice." Id. at 338 (quoting Abraham P. Ordover, Balancing the Presumptions of Guilt and Innocence, 38 Emory L.J. 135, 160 (1989)).[3] If the evidence is admissible, the trial judge must instruct the jury on the limited use of the evidence to "explain precisely the permitted and prohibited purposes of the evidence." Id. at 340-41. We afford great deference to a trial court's determination of the admissibility of bad act evidence and will not reverse unless

---

[3] We recognize that the Supreme Court has held that the second prong of the Cofield formulation need not be applied in all cases. See State v. Williams, 190 N.J. 114, 131 (2007).

there is an abuse of discretion or a clear error in judgment.  State v. Brown, 170 N.J. 138, 147 (2001).

During the State's cross-examination of Verity, it played an excerpt of Verity's October 22, 2018 interview in which he asked the officer, "[h]ow many more deaths have you guys had?"  The officer replied, "there was one that night, but there hasn't been any since really."  Verity then stated, "[r]eally good.  So I helped take out the killer."  To which the officer replied, "Yeah, yeah, you did a good job, man.  I think."

Small did not object to this evidence.  Regardless, N.J.R.E. 404(b)(1) pertains to "a person's disposition."  Verity's conversation with the officer did not constitute prior bad acts evidence because Verity neither identified Small in the conversation nor claimed Small was responsible for the other death.

Small next claims the State improperly introduced text messages sent to him, which indicated he had dealt drugs on other occasions.  In one instance, the State asked Small about a reference to "hoagie" in a text sent to him.  Small responded that the text was from a friend who was "asking [Small] for marijuana."  Small's attorney objected but then withdrew the objection.

Evidence that is necessary to prove the charged crime is intrinsic and not other crime evidence under N.J.R.E. 404(b).  State v. Rose, 206 N.J. 141, 180

(2011). There was no question whether a drug deal between defendants took place on October 3, 2018. Evidence of the nature of the drugs Small sold was intrinsic to the conspiracy charge. For these reasons, N.J.R.E. 404(b) did not apply and a limiting instruction was not required.

During Small's cross-examination, the State asked whether his mention of "bricks" in two of the texts was a reference to heroin or to a person. Small's counsel objected because he never received a copy of the message. Although the judge initially permitted the State to ask the question, he subsequently ruled it could not and instructed the jury to disregard and not consider it during deliberations. Therefore, this evidence was not admitted as N.J.R.E. 404(b) evidence or otherwise.

Small claims prior bad acts evidence was admitted during Verity's cross-examination where Verity was asked whether the person he went to see for the drugs was his supplier. Verity responded he "had a couple of different suppliers." Again, this was not improper N.J.R.E. 404(b) evidence because Verity did not name Small during the exchange and there was already evidence admitted that Verity was Small's long-time friend and Small had sold drugs to Verity on the date of MacFarlane's death.

Small further points to the prosecutor's summation during which he stated defendants "had a relationship before, a drug relationship." Defendant did not object. Regardless, this did not violate N.J.R.E. 404(b) because there was no dispute Verity had purchased drugs from Small prior to October 3, 2019, because Small testified to that effect. The only question was the kind of drugs defendants believed they were buying and selling on that date.

Small challenges the admission of a portion of Verity's second statement to police that Small had "up to a quarter-pound of heroin," and was a "one-stop-shop" for drugs. There was no objection to this statement, and Small did not deny he had previously sold drugs to Verity. Additionally, Verity testified he sought and purchased what he believed to be heroin from Small on October 3. Therefore, the admission of this evidence did not constitute plain error.

Small argues evidence was improperly adduced, without a limiting instruction, that he had two third-degree and one fourth-degree conviction in 2014 and 2015, respectively, and served prison time. The evidence was elicited by the defense on direct examination and the convictions were sanitized. Small did not ask for a limiting instruction and the court did not give one. A limiting instruction is required when the State seeks to impeach a testifying defendant

through introduction of the defendant's prior convictions.  State v. Brunson, 132 N.J. 377, 391 (1993).  For these reasons, we discern no reversible error.

## V.

Verity asserts the State's summation deprived him of a fair trial.  He points us to the following passage:

> Trials are many things for many people, ladies and gentlemen.  It is forced responsibility.  You must force responsibility on two men who enjoy under the same law that I submit to you is going to convict them, the benefit of innocence, the same law.  The same laws that have protected them for a year, if you follow the law, and that presumption today, tomorrow when you come back and you return verdicts that I submit to you should be guilty.

Verity claims the "forced responsibility" remarks constituted prosecutorial misconduct because the State told the jury it was its duty to convict.

"Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented."  State v. Patterson, 435 N.J. Super. 498, 508 (App. Div. 2014) (quoting State v. R.B., 183 N.J. 308, 332 (2005)).  "Telling jurors that their sworn obligation is to convict or that they would not have met their 'responsibility' unless they convicted is disapproved."  State v. Stewart, 162 N.J.

Super. 96, 104 (App. Div. 1978) (quoting State v. Knight, 63 N.J. 187, 193 (1973)).

"In deciding whether prosecutorial conduct deprived a defendant of a fair trial, 'an appellate court must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred.'" State v. Williams, 244 N.J. 592, 608 (2021) (quoting State v. Frost, 158 N.J. 76, 83 (1999)). "In reviewing closing arguments, we look, not to isolated remarks, but to the summation as a whole." State v. Atwater, 400 N.J. Super. 319, 335 (App. Div. 2008) (citing State v. Carter, 91 N.J. 86, 105 (1982)).

Reversal is appropriate only where the misconduct was so egregious as to deprive the defendant of a fair trial. State v. Smith, 167 N.J. 158, 181 (2001). The question is "whether it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict if the questioned conduct had not occurred." State v. Walden, 370 N.J. Super. 549, 562 (App. Div. 2004).

We are unconvinced the prosecutor's remarks deprived defendants of a fair trial. At the outset, we note although there were objections by the defense during the State's summation, the defense did not object to the comments now raised on appeal. Moreover, our review of the entirety of the summation

51

convinces us the prosecutor's remarks fell short of suggesting the jury had a duty to convict. The first "forced responsibility" comment was the prosecutor reminding the jury of the purpose of a trial. The second mention of this phrase reminded the jury defendants were presumed innocent, but requested they find defendants guilty by applying the law. Moreover, because defendants were accused of causing MacFarlane's drug-induced death, it was not unreasonable for the State to argue "responsibility" to ascribe the death to defendants' conduct rather than MacFarlane's illicit drug use. We are unconvinced the uncontested comments during summation were so egregious as to deprive defendants of a fair trial.

VI.

Verity contends the court erred by first interrupting his attorney's summation and then improperly instructing the jury contrary to the final charge it would later give them. During his summation, Verity's attorney stated: "On the first charge of the verdict sheet is going to be a drug-induced death charge and in order for [Verity] to be charged with that, he had to distribute the drugs to MacFarlane and McCurdy, and he also had to . . . know . . . there was fentanyl in those drugs." The State objected and argued the defense mischaracterized the law because the State did not have to prove defendants distributed fentanyl. The

judge told the prosecutor "do your closing with you being able to say that . . . Verity would have had to have known that it was a [CDS].  Doesn't necessarily have to know it was fentanyl."  The judge stated he would correct the general jury charge to reflect a correct statement of the law.  The trial judge then instructed the jury as follows:

> I'm just going to give you a brief instruction with regard to the objection to [the] last comment that was made by [Verity's attorney], which was that essentially it's the State's burden to show that . . . Verity knew that the substance was fentanyl.  And the way the law reads, and I'll give you more specific instruction on this tomorrow, is that . . . under this charge . . . a defendant must know that the substance was a [CDS] in either Schedule I or Schedule II.  So with that correct, I'll ask you to disregard the last comment specific[ally] as to fentanyl . . . .

The following day, the judge informed counsel he decided because the indictment referred only to fentanyl "the jury charge should say fentanyl," not heroin or fentanyl or Schedule I or II drugs.  After a colloquy, the prosecutor asked for a stay pending appeal of the judge's ruling.[4]  The judge denied the stay because the toxicological evidence only revealed the existence of fentanyl and mentioning heroin would be inconsistent with the indictment.

---

[4]  The State filed an emergent appeal but withdrew it after the verdict.

Verity's attorney then requested a "limiting" instruction regarding the trial judge's interruption of his summation the previous day. The judge offered to instruct the jury that summations do not constitute evidence. However, counsel withdrew the request for the instruction, telling the judge "you don't need to say anything else. . . . Just read them the [general] charges."

Where a defendant fails to request a curative instruction, they "must show that the failure to give such an instruction sua sponte constitutes an error 'clearly capable of producing an unjust result.'" Mays, 321 N.J. Super. at 633 (quoting State v. Loftin, 287 N.J. Super. 76, 97 (App. Div. 1996)). Although Verity's counsel withdrew the request for a curative instruction, the instruction the judge proposed to give to correct his error was ultimately given when he read the jury the final charges before it deliberated. Indeed, the judge stated:

> Regardless of what counsel said or I may have said recalling the evidence in this case, it is your recollection of the evidence that should guide you as judges of the facts. Arguments, statements, remarks, openings and the summations or closings of counsel are not evidence and must not be treated as evidence.

These instructions tracked model jury charges 1.12B and 1.12C. We discern no reversible error.

VII.

Both defendants argue the cumulative effect of the errors at trial undermined their constitutional rights to due process and a fair trial. We are satisfied that none of the unreversed errors alleged by defendant, individually or cumulatively, warrant the granting of a new trial. State v. T.J.M., 220 N.J. 220, 238 (2015); State v. Orecchio, 16 N.J. 125, 129 (1954).

## VIII.

Finally, we address each defendant's arguments regarding sentencing. Sentencing decisions are discretionary in nature. State v. Cuff, 239 N.J. 321, 347 (2019). Therefore, we review for an abuse of discretion. State v. Jones, 232 N.J. 308, 318 (2018). We defer to the sentencing court's factual findings and should not "second-guess" them. State v. Case, 220 N.J. 49, 65 (2014).

"To facilitate meaningful appellate review, trial judges must explain how they arrived at a particular sentence." Id. at 65. We will reverse a sentence where: the findings of fact on the aggravating and mitigating factors were not based on competent and credible evidence in the record; the court applied the incorrect sentencing guidelines enunciated in the criminal code; and the application of the facts to the law constituted such an error of judgment as to shock the judicial conscience. State v. Roth, 95 N.J. 334, 363-65 (1984).

Because we have reversed the drug-induced charge convictions, each defendant's sentence must be remanded for reconsideration. However, we address the sentencing arguments raised on the appeals for sake of completeness and to provide guidance to the sentencing judge.

A.

Verity's remaining sentencing argument not related to the drug-induced death conviction is that his sentence was excessive because the mitigating factors outweighed the aggravating factors. The judge found the following aggravating factors: the risk that defendant would commit another offense, N.J.S.A. 2C:44-1(a)(3); the extent and seriousness of his prior criminal record, N.J.S.A. 2C:44-1(a)(6); and the need to deter Verity and others, N.J.S.A. 2C:44-1(a)(9). The judge found the following mitigating factors: Verity did not contemplate that his conduct would cause or threaten serious harm, N.J.S.A. 2C:44-1(b)(2); the victim induced or facilitated its commission, N.J.S.A. 2C:44-1(b)(5); and Verity cooperated with law enforcement, N.J.S.A. 2C:44-1(b)(12).

The judge accorded each aggravating factor substantial weight, mitigating factor one moderate weight, and the remaining mitigating factors slight weight. He concluded the aggravating factors substantially outweighed the mitigating factors. But for the now-reversed drug-induced death conviction, we discern no

error in the sentence as whole.  However, the sentence must now be reconsidered in light of the vacatur of the Verity's first-degree offense.

B.

Small also argues his sentence is excessive, disparate, and the trial judge improperly weighed the aggravating and mitigating factors.  He also claims the judge's imposition of consecutive sentences was error.

The trial judge sentenced Small as a persistent offender but denied the State's application to sentence him to an extended term.  He noted Small's criminal history included "[forty-three] adult arrests with . . . six indictable convictions."  The judge found the following aggravating factors:  the risk of re-offense, N.J.S.A. 2C:44-1(a)(3); the extent and seriousness of Small's prior criminal record, N.J.S.A. 2C:44-1(a)(6); and the need to deter Small and others, N.J.S.A. 2C:44-1(a)(9).  The judge found no mitigating factors.  He concluded the aggravating factors substantially outweighed any potential mitigating factors.

Given Small's criminal history, the trial judge found the ordinary maximum first-degree sentence of twenty years was appropriate on the drug-induced death conviction.  He imposed a consecutive five-year sentence on the

distribution of CDS conviction and merged the conspiracy conviction into the distribution conviction. In imposing the consecutive sentences, the judge stated:

> [W]hether a sentence for distribution should be consecutive or concurrent . . . would essentially ask the [c]ourt to find distinguishing characteristics between the two offenses . . . . [T]he continued conclusion of the [c]ourt and review of the factors reveal and the [c]ourt finds that they stem from the same one act. And, as a result of that, they are not distinct, but . . . the Legislature intended that the drug-induced death should stand on its own as it relates to distribution and vice-versa.

The trial judge did not abuse his discretion in weighing the aggravating and mitigating factors. Contrary to Small's assertions the judge gave too much weight to his prior criminal record, his criminal history revealed he had several convictions that were not for minor offenses.

Small claims the judge failed to consider he was sixty years of age in assessing whether he was at risk of re-offending and the need to deter. Our Supreme Court has stated: "[A]ge alone cannot drive the outcome. An older defendant who commits a serious crime . . . cannot rely on age to avoid an otherwise appropriate sentence." State v. Torres, 246 N.J. 246, 273 (2021). Therefore, the judge's application of the aggravating factors was supported by the record.

Small contends the judge should have applied mitigating factor N.J.S.A. 2C:44-1(b)(2) because he did not contemplate his conduct would cause serious harm.  Regardless of whether Small believed he was selling heroin or fentanyl, either drug was dangerous and could cause serious harm.  We are unconvinced by this argument.

Small argues his sentence was nearly twice that of Verity's and the judge erred when he failed to consider the disparity.  A sentence "is not erroneous merely because a co-defendant's sentence is lighter."  State v. Roach, 146 N.J. 208, 233 (1996) (quoting State v. Hicks, 54 N.J. 390, 391 (1969)).  The central question in assessing disparity in sentences is "whether the disparity is justifiable or unjustifiable."  Ibid.  The court must determine "whether the co-defendant is identical or substantially similar to the defendant regarding all relevant sentencing criteria."  Ibid.

Here, the record shows Small and Verity did not stand in identical or substantially similar positions at sentencing.  They played different roles in the underlying offenses:  Small provided the drugs, Verity was an addict, and there was no evidence Verity was aware the drugs contained fentanyl.  Therefore, we reject the sentence disparity argument.

59

In determining whether sentences should be concurrent or consecutive, the sentencing court must consider the following guidelines:

(1) There should be no "free crimes" in a system where punishment fits the crime.

(2) The reasons for consecutive or concurrent sentences should be separately given.

(3) The court should consider the facts of the crime, including whether:

(a) the crimes and their objectives were independent of each other;

(b) the crimes involved separate acts of violence;

(c) the crimes were committed at separate times or places, rather than indicating a single period of aberrant behavior;

(d) the crimes involved multiple victims;

(e) the convictions are numerous.

(4) There should be no double counting of aggravating factors.

(5) Successive terms for the same offense should ordinarily not equal the punishment for the first offense.

[Torres, 246 N.J. at 264 (citing State v. Yarbough, 100 N.J. 627, 643-44 (1985)).]

A-2255-19

Small claims the trial judge did not conduct a <u>Yarbough</u> analysis and to the extent he did, the findings support a concurrent rather than a consecutive sentencing. Although we have reversed the strict liability offense, our review of the sentencing transcript reveals the judge appeared to believe he was required to impose consecutive sentences due to the nature of the first-degree strict liability conviction. The State acknowledges this was an error as well.

An explicit statement for imposing consecutive sentences remains essential to a proper <u>Yarbough</u> sentencing assessment. <u>Torres</u>, 246 N.J. at 268. The judge did not perform a <u>Yarbough</u> analysis. Regardless, defendant's sentence is remanded for reconsideration given the reversal of the strict liability conviction.

Affirmed in part and reversed and remanded in part for further proceedings in A-2255-19 and A-3381-19 with respect to the strict liability drug-induced death convictions and related sentencing consequences. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

_____

**SABATINO, P.J.A.D., concurring.**

I join in nearly all of the majority's well-crafted opinion. I write separately to express a few words of concern about the interrogation issue raised by defendant Verity.

Last term the Supreme Court in State v. Bullock disapproved of police investigating a serious crime and assuring someone in their custody that the person is "not in trouble[,]" and then obtaining incriminating statements from that person. 253 N.J. 512, 519-20 (2023). I acknowledge the assurances the Court criticized in Bullock preceded the issuance of a Miranda warning, whereas the present case involves "not in trouble" assurances that followed a Miranda warning. Yet, the sequence here also presents constitutional concerns because the assurance has the capacity to dilute the practical impact of the warning that was issued. The message the detainee undoubtedly hears is that, despite the formal warning, it's safe to speak freely to the officers.

The majority opinion correctly states that certain forms of trickery have traditionally been deemed acceptable during police interrogations. See, e.g., State v. Baylor, 423 N.J. Super. 578, 588-89 (App. Div. 2011); State v. Patton, 362 N.J. Super. 16, 29-31 (App. Div. 2003). However, trickery is not permissible if it undermines the Miranda warning itself and causes the detainee

to disregard or discount the warning's importance. See, e.g., Bullock, 253 N.J. at 538-39; State v. O.D.A.C., 250 N.J. 408, 420-21 (2022); State v. Diaz, 470 N.J. Super. 495, 503 (App. Div.), leave to appeal denied, 251 N.J. 8 (2022); State v. Puryear, 441 N.J. Super. 280, 298-99 (App. Div. 2015).

The majority reasons that the "not in trouble" assurances to Verity were inconsequential because the record did not reflect that the police considered Verity to be a suspect in MacFarlane's drug-induced death at the time the police interviewed him. Even if that lack of realization is true—and, for what it's worth, another officer testified at trial she believed her fellow officer had lied to Verity about him not being in trouble for the death—that does not vitiate the assurance's likely impact on the detainee.

As this court recently noted in another Miranda context in the juvenile case of State in Interest of M.P., the pertinent legal standards are objective, and do not hinge upon the subjective state of mind of the interviewing police officers. 476 N.J. Super. 242, 290 (App. Div. 2023). We held "the critical issue . . . is not what police knew about M.P. and whether they could be expected to know about his intellectual and educational challenges. Rather, . . . the critical issue is whether, considering the totality of the relevant circumstances, M.P. knowingly, intelligently, and voluntarily waived his constitutional right against

2

self-incrimination."  Ibid.  This court "reject[ed] the notion that a reviewing court can disregard circumstances deemed relevant under the case law on the grounds those circumstances were not known by or 'noticeable' to police."  Ibid.

In my own view, I respectfully submit it would be a better practice for police officers who have detained persons and given them Miranda warnings to refrain from assuring them that they are "not in trouble."  I recognize it is human nature to not unduly alarm or antagonize a person in custody that something adverse may occur, but the constitutional rights at stake must be carefully protected.

That said, I do not dissent from the majority's disposition of the Miranda issue in Verity's case but recommend that future similar post-Miranda assurances that undermine the warning—even if made in good faith—be discouraged.  And, if such "not in trouble" assurances are nonetheless made, they should be considered as negative factors within the totality of circumstances in evaluating whether a post-warning admission was voluntary.  That approach is consistent with the principles expressed in Bullock and our judiciary's tradition of guarding with care the privilege against self-incrimination set forth in the Fifth Amendment, New Jersey common law, and N.J.S.A. 2A:84A-19.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2255-19